

**ROBERT A. GORDON**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| Lisa Ann Rixham | * | Case No. 12-29426-RAG |
| Debtor | * | Chapter 7 |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

| | | |
|---|---|---|
| Vladimir Fridman | * | |
| Plaintiff | * | |
| v. | * | Adv. No. 13-00079 |
| Lisa Ann Rixham | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM OPINION
### IN SUPPORT OF JUDGMENT ORDER EXCEPTING
### <u>DEBT FROM DISCHARGE</u>

## I.     <u>Preliminary Statement</u>

The question presented by this Adversary Proceeding is whether the Plaintiff/Judgment

Creditor, Mr. Fridman, the individual 100% owner of the corporate creditor, Golden Gate

Enterprises, Inc. (Golden Gate), may personally prosecute an 11 U.S.C. § 523(a)[1] exception to discharge claim that arises from debts that were instigated by the Debtor's intentional misrepresentations but were technically extended by Golden Gate. The question is a knotty one but the Court concludes that the word "debt" should be interpreted expansively enough in this context to include this entire transaction such that the Plaintiff, Mr. Fridman, has sufficient standing to enforce the prescribed remedy for the fraudulent conduct. Accordingly the debt shall be excepted from the Debtor's discharge.

## II.   <u>Factual Findings</u>

### A.   **Summary of the Underlying Transactions**

In 2006, Mr. Fridman was the sole shareholder and President of Golden Gate. Ms. Rixham was the President and a shareholder of Houston's Custom Home Design, Inc. (Houston's)[2]. Houston's purported to be a home improvement contractor, capable of performing professional and expert services of that nature.

Mr. Fridman and his significant other, Tamara Friedman[3], were considering having a backyard deck constructed for their primary residence.[4] They received a general, neighborhood "mailer" from Houston's advertising its home remodeling services and decided to follow up. To that end, Mr. Fridman contacted Houston's and thereafter met with Michael Ledwith and Steven Becker, Houston's main contractors. At the time, Mr. Becker also owned and operated his own home improvement company, SrB Design Build, Inc. They agreed to work up a project bid and

---

[1] Unless otherwise noted, all statutory citations are to the Bankruptcy Code, found at Title 11 of the United States Code and all rule citations are to the Federal Rules of Bankruptcy Procedure.

[2] Ms. Rixham's fellow colleagues in the Houston's enterprise were Michael Ledwith, Vice-President and shareholder, and Steven Becker, shareholder. Mr. Becker was listed as Treasurer on Houston's website but he denied that he actually held that office.

[3] From time to time during this Adversary Proceeding, Ms. Friedman was referred to as Mr. Fridman's wife. However, although apparently in a long standing relationship, they were not married.

[4] Mr. Fridman was the sole owner of the residence.

took Mr. Fridman to view an ongoing project of Houston's not far from where Mr. Fridman lived.

Messrs. Ledwith and Becker also invited Mr. Fridman and Ms. Friedman to the grand opening of Houston's "showroom", a facility apparently purposed to give examples of the variety of home remodeling and construction services offered by Houston's. It was there that Mr. Fridman met Ms. Rixham. Mr. Fridman testified that Ms. Rixham "bragged" about Houston's and informed him that the company was, "fully licensed to perform home improvement work in the State of Maryland." Although Mr. Fridman was impressed overall with Houston's and its agents, he made the economic decision not to go forward with the backyard deck construction at that time.

In the summer of 2007, Mr. Fridman again contacted Houston's regarding the possibility of having work done at his residence. This time, he and Ms. Friedman were considering transforming the look of their front yard by way of extensive landscaping and design work (Front Yard Project). At Mr. Fridman's request, Mr. Ledwith met Mr. Fridman at Mr. Fridman's home to discuss the project. While the precise timing is a bit unclear, it appears that in the wake of that meeting the parties became more personally acquainted. In that spirit, Mr. Fridman and Ms. Friedman extended an invitation to Mr. Ledwith and Ms. Rixham to dine with them at their home. The visit turned into an all-day affair and at some point, the question was raised by Mr. Ledwith and Ms. Rixham as to whether Mr. Fridman might be willing to invest, and/or become a partner, in Houston's. According to Mr. Fridman, Ms. Rixham gave him a sales pitch that promoted and extolled Houston's financial growth and well-being. Per Mr. Fridman's testimony, she also stressed the fact that the company was still licensed and bonded. Ms. Rixham explained that Houston's rapid growth and the attendant influx of business mandated a cash investment to keep up with its projected customer demands. Nevertheless, Mr. Fridman and

Ms. Friedman ultimately declined the investment opportunity and instead Mr. Fridman offered to make a loan to Houston's.  Houston's accepted the offer.  To make the loan, Mr. Fridman drew from his personal home equity line of credit secured by his residence and transferred the proceeds to Golden Gate's bank account.  He then drew a $75,000 check from Golden Gate's account and that was the check made payable to Houston's (Golden Gate Loan).  The Golden Gate Loan check was dated August 14, 2007.

The parties also memorialized their commitment to the Front Yard Project the same day. The agreement (FYP Agreement), drawn-up by Mr. Ledwith and also dated August 14, 2007, included on its face Mr. Becker's Maryland home improvement contractor's license number.  A price tag of $75,682 was set for the project and Mr. Ledwith signed the FYP Agreement on behalf of Houston's.  However, Mr. Fridman did not write a personal check to cover the deposit but instead caused Golden Gate to write one to Houston's for the sum of $20,000.[5]  Both the $75,000 check and the $20,000 check were written the same day, August 14, 2007.[6]  These checks, including the progress payment, were all drawn on Golden Gate's bank account.  It is plain, therefore, that Mr. Fridman intended the monies to be funneled through Golden Gate, as if it were making the loan.  The Golden Gate Loan was never repaid and Golden Gate took a "bad debt" loss on its 2008 corporate tax return.[7]

---

[5] The $20,000 deposit check was also sourced from Mr. Fridman's home equity line of credit.

[6] On October 18, 2007, Golden Gate made a progress payment of $14,003. There was no evidence that confirms that this payment came from Mr. Fridman's home equity line of credit. That impact of that evidentiary hole will be discussed at the end of this Opinion.

[7] The Court finds and concludes that both the $75,000 and $20,000 checks were drawn after the dining engagement at Mr. Fridman's home.  Ms. Rixham asserted that the dining engagement took place after Labor Day and therefore in September.  Her version of the timing could be interpreted as taking her somewhat out of the loop in terms of crucial events.  However, the Court does not believe her recollection is accurate.  The $75,000 check must have been drawn after the investment/loan request was made, not before as would be the case if the dining engagement occurred in September.  Moreover, Ms. Rixham has other credibility issues that will be highlighted further on.

4

When Mr. Fridman's social fellowship was extended and the money lent, Ms. Rixham's home was subject to an Indemnity Deed of Trust (IDOT) that secured a $75,000 principal balance loan in favor of a Mr. Bernard Caplan (Caplan Loan). The Caplan Loan had been made to Houston's in 2006 under circumstances eerily reminiscent to the creation of Mr. Fridman's loan. Mr. Fridman was not informed by Ms. Rixham of either the Caplan Loan or the IDOT and was completely unaware of their existence when he made the Golden Gate Loan. The Caplan Loan was due and payable in August 2007, a year after its creation. The Golden Gate Loan was used to satisfy that indebtedness. Once the Caplan Loan was paid, the IDOT was released from Ms. Rixham's home. Houston's never completed the Front Yard Project and the Golden Gate Loan was never repaid. By Mr. Fridman's unrebutted testimony, Houston's abandoned the project and left his front yard in a state of ugly, haphazard, disrepair.

**B.**    **Trial Testimony**

*1.    Vladmir Fridman*

Mr. Fridman was the first witness called in support of his case in chief. He began by explaining that in the past he had amassed some experience "flipping houses". This meant he would purchase distressed residential real estate at a low cost and then hire contractors to renovate the property, in order to resell it at a profit. He emphasized that when hiring, a primary concern was whether the contactor was licensed. As he stated:

> [I]t is really important for me to know that the contractor that's going to be performing the job at any property that I'm dealing with is backed up by Home Improvement Commission and -- in case of something (sic), goes south, I can always file a claim with Home Improvement Commission and be able, maybe, to recover some of the money.

Tr. at 23.

Mr. Fridman then testified as to how he became familiar with Houston's after receiving the "mailer" and his first meeting with Mr. Ledwith and Mr. Becker. He testified that they both bragged about the high quality of work they offered in remodeling and home improvement. They invited him to the open house of Houston's new showroom and that is where he met Ms. Rixham. She was introduced as the President of Houston's and assured Mr. Fridman that Houston's was capable of handling from start to finish the back yard deck project he was considering. Mr. Fridman testified:

> And Lisa did tell us that she looked into the -- she looked into the upcoming project that we had in mind, and she said that it would be no problems, (sic) that Houston's possess (sic) everything they need to take this project from start to end. So at the end of the party when we left, I mean, we had a very great first impression of Houston's as a whole, being a great company. And again, showroom (sic) is when the first time I met Lisa Rixham.

*Id.* at 27. Mr. Fridman was asked whether Ms. Rixham talked about Houston's licensing at their initial introduction.

> Q.    (By Mr. Burns): What, if any, discussion was there of the licensing or bonding or any of the other attributes required of the company?
>
> A.    (Mr. Fridman): At that time?
>
> Q.    Yeah.
>
> A.    I'll repeat myself. Yes, she did introduce as the president -- herself as the president of the company, that the company is fully licensed to perform home improvement work in the State of Maryland.

*Id.*

While Mr. Fridman decided not to hire Houston's at that time, in mid-2007 he again reached out to Houston's regarding the Front Yard Project. In part, he explained he and Ms. Friedman believed the improvement would increase the value of the home:

6

Q:      (By Mr. Burns):  Can you briefly describe to the Court
        what you had in mind for the project in the front yard?

A:      (Mr. Fridman):  The front yard, again, the work that we had
        in mind, again, is -- we wanted to build a fence, completed
        again, with cinderblocks and faced with bricks.  We wanted
        to build the circular driveway with the upper patio and
        balcony and lower patio, again, stone pillars, stone patios,
        light fixtures, and fountain pool in the middle of the -- kind
        of like a centerpiece of the front yard.

        So it was pretty extensive work.  And it did require a lot of
        -- from what I understood -- a lot of knowledge and skills
        to take on and make that project successful.

*Id.* at 29.  This time, only Mr. Ledwith was involved in discussions with Mr. Fridman regarding

the Front Yard Project; neither Ms. Rixham nor Mr. Becker participated in the detailed planning.

        As discussions progressed and personal kinship grew, Mr. Fridman and Ms. Friedman

decided to invite Mr. Ledwith and Ms. Rixham to their home.

Q:      (By Mr. Burns):  Did there come a time when you hosted a
        dinner for Lisa Ann Rixham and Michael Ledwith at your
        home?

A:      (Mr. Fridman):  So again, as I felt we're coming closer, and
        I'm pretty sure the other parties felt the same way, we
        thought it would be a good idea to invite them for dinner
        and have everybody at the table and just have a social
        conversation.

Q:      Was this a short dinner, a couple hours, or --

A:      Short dinners never happen in our house. I mean, we
        started, I think at 1 -- at 10 or 11, and I don't even -- we
        finished late at night.

Q:      10 or 11 in the morning?

A:      I believe so, yes.

Q:      What conversations did you have with Lisa Ann Rixham
        concerning your home improvement project and Houston's
        at that dinner?

7

> A:    I mean, we -- and so we -- we started with, again, social -- just social conversations and a few drinks, and again, talking about the family and kids and stuff like that. And we slowly moved to talk about the details of the project and, you know, what's going to get done, what needs to -- what does it require to get started, things like that, things in that nature (sic).
>
> But then again, Lisa said she's still the president of the company and the company is doing great. The company is still licensed and bonded. And the personnel and contractors working for the company and – everybody's professional, and they have everything they needed to start this proj -- to pick up on this project and make it a success.

*Id.* at 31-32.

Mr. Fridman testified that while Ms. Rixham touted Houston's overall success, she also indicated the business was experiencing a short-term financial setback. Per her spiel, the business needed a cash infusion to better secure new clients and expand the business. Mr. Fridman testified:

> And at some point, I was offered -- Lisa offered a partnership. So if I would invest -- the question that was brought up, whether or not I'm going to be able to help the company and invest into the company (sic). And if I do invest, if I want to become a partner.

*Id.* at 32-33. Mr. Fridman and Ms. Friedman ultimately decided they were unwilling to invest or become partners but they still wanted to support Houston's success, albeit from an arm's length distance. Hence, Mr. Fridman decided it would be an acceptable risk to make a loan in an amount that roughly equated with the cost of the Front Yard Project. He testified:

> Lisa gave me a rough number of the -- of the -- rough price quote on the job that was going to go on in the front yard. And that price was between 70- to 80,000. So in the back of my mind, 75,000 sounded right. And I thought if anything, if they're not able to repay it right away, we're still going to be able to work it out, because they're still doing the job, they're still working on my property. And the cost of the project is about the same as the loan amount.

8

*Id.* at 33.

Mr. Fridman testified that it was his express understanding, based upon what he was told, that the $75,000 loan was to be used to expand Houston's.

> Q:   (By Mr. Burns):  Mr. Fridman, what did Ms. Rixham say, if anything, about the intended use of the 75,000-dollar loan that you were discussing with her?
>
> A:   (Mr. Fridman):  Expand the business.  Like I said, they were getting more clients and more jobs than they could handle. They needed to grow financial -- financial base (sic) to secure the projects, to buy more materials, to hire more people to work.
>
> Q:   Did she, at any time during your conversation, reveal that she had a 75,000-dollar IDOT on her home that was owed to Bernie Caplan from a prior debt of Houston's Custom Home that had been loaned to her by Mr. Caplan?
>
> A:   No, she did not. … And if I would be told ahead of time (sic) that, hey, Vlad, you know what, we don't have a home improvement license, and you know what, we can't complete this project, and you know what, the money I'm borrowing from you, it's to pay off my personal loan or I'm going to lose my house, like I said, I'm not insane.  I wouldn't sign off on the project.  I wouldn't sign off on the loan.

*Id.* at 34-35.  Content with the information he did have, Mr. Fridman decided to extend the loan to Houston's and engage it as contractor on the Front Yard Project, which he expected to be completed in two to three months.  He testified:

> The decision was to get the contract -- signed contract from Houston's.  And as they bring the signed contract (sic), we knew what the rough numbers were, we felt comfortable with it, and yeah, we decided to go ahead with the project, and we decided to help them out with the personal loan as well.

*Id.* at 36.

During his testimony, Mr. Fridman identified the FYP Agreement and noted the Maryland Home Improvement Commission (MHIC) license number listed on its face.  Pl.'s Exh.

6.  In sum, Mr. Fridman came away confident in the *bona fides* of Houston's skill, ability and overall business condition.

Mr. Fridman wrote the $75,000 Golden Gate Loan check on August 14, 2007 and gave it to Mr. Ledwith.  Pl's Exh. 6B.  Mr. Fridman testified that Houston's representatives proposed an 18 month repayment term but he thought better of that proposal.  He testified:

> [Mr. Ledwith] brought that in and he said Lisa put together a plan how to pay it off.  And it was stretched out for about a year-and-a-half, and to me it was a little bit more time than I could loan the money for (sic).  And I don't remember what the interest -- I don't remember the details.  I just remember the time that was too long for me to wait (sic).
>
> And what I did say to Michael, I said how about I'll give you six months, interest free, instead of what you have?  He picked up the phone right -- I mean, he called Lisa and after a short conversation with Lisa, he hung up and said, Vlad, we're good for it.  And that was that.
>
> So with that "Vlad we're good for it", I signed the check and gave it to Michael.

Tr. at 40.

The Golden Gate Loan was not immediately memorialized with either a promissory note or other loan documentation.  Mr. Fridman explained the source of the funds:

> I had some equity in my house.  And this is where the money came from (sic).  The money came from home equity line (sic) to Golden Gate, and from Golden Gate, the check was written to -- on 75,000 (sic) to make that personal loan.

*Id.* at 42.

Mr. Fridman was asked why he caused Golden Gate to loan the money.

> Q:      (By Mr. Burns):  Whose money was contained in the HELOC advances?
>
> A:      (Mr. Fridman):  It's my personal money.

10

Q:    Why would you put that money into Golden Gate Enterprises, Inc., rather than just write a check for your home contracting services, personally?

A:    We're -- it's one pocket.  The money's coming -- I mean, I understand it's coming from different accounts, but it's all my money.  And why would I write -- I write some checks from my business account to cover my business expenses and as well as, you know, personal expenses.  The way I see fit better to me (sic).  And I do the same for my personal.  Sometimes I cover my personal expenses and I cover my business expenses, and the other way -- and the other way around.

I didn't have the money on my business account to support 75,000 loan (sic), so I took the money from home equity line (sic) and transferred it to my business account and wrote the check for 75,000 dollars to Houston's.

*Id.* at 44-45.  As indicated above, the FYP Agreement was also dated August 14, 2007. However, Mr. Fridman was dismayed to learn that instead of Houston's immediately breaking ground on the project, Mr. Ledwith and Ms. Rixham indicated that they were going on vacation. Work did eventually begin but the level of commitment was spotty at best.  In fact, not long after the parallel deals were struck, the individuals affiliated with Houston's – Ms. Rixham, Mr. Becker and Mr. Ledwith − stopped responding to Mr. Fridman's telephone calls.  He then decided that the loan transaction should be memorialized in writing.  *See* Pl's. Exh. 5.

Q:    (By Mr. Burns):  Okay. And when did you prepare this promissory note and why?

A:    (Mr. Fridman):  As it got harder and harder for me to reach anybody from Houston's, I thought maybe I should have some document supporting the fact that I did loan the money, 75,000, to whoever -- Lisa, Houston's, Michael, all of them.  I just wanted to make sure that everybody gets in. And yeah, professionally or unprofessionally, I created this note, and I asked Michael to sign and give it to Lisa and have her sign.

11

>At the same time I included Tamara in this promissory note, god forbid something happens to me. So she's part of it as well.
>
>Q:   If it was your money that you advanced in these transactions, your personal money, why did you list Golden Gate Enterprises on the promissory note?
>
>A:   It didn't matter to me at all. What did matter to me is that everybody on my end gets into this promissory note (sic), and everybody on Houston's end gets into this promissory note as well (sic).

*Id.* at 47. Mr. Fridman, however, did not include Ms. Rixham on the promissory note.

>Q:   (By Mr. Burns): Is there a reason you didn't list Lisa Ann Rixham on the promissory note as the person who is obligated?
>
>A:   (Mr. Fridman): No, no. There is no reason. And I -- to be honest with you, I don't remember why she is not listed. But although -- there is her signature, the president of the company. So, again, no reason.

*Id.* at 48.

Thus, Mr. Fridman's self-drafted note was signed by Ms. Rixham as President of Houston's but not in her personal capacity. Mr. Ledwith signed the note individually. Pl's Exh. 5.

Work on the Front Yard Project progressed sporadically until about December 2007 when it came to a dead stop. Thereafter, none of the Houston's workers returned. The front yard was in a shambles with pieces of heavy equipment sitting dormant and Mr. Fridman was left with a major eyesore in his front yard. He tried to contact Houston's to discuss the unpleasantness during late December 2007 and then into 2008. But he was not successful. He testified that he sent multiple emails and made multiple telephone calls to both Mr. Ledwith and Ms. Rixham to no avail.

As for the state of his yard, Mr. Fridman testified:

> And the fact is, I mean, it did look pretty ugly.  And it did look like abandoned project (sic).  Like any abandoned property that you see, this is what it looked like.  Except in the neighborhood where I lived, I started receiving communications from Columbia Builders asking me what's the -- what's the plan and what's the progress of this project, because neighbors are complaining.
>
> And I literally had to go door-to-door to my neighbors and apologize for the mess and for the whole look that my front yard project gave the entire neighborhood.

*Id.* at 59.  He testified that he consulted with other contractors and an inspector and was told that most of the work was unsalvageable and would need to be demolished with the project commenced anew.

Finally, Mr. Fridman sent a certified letter to Houston's and that sparked a response from Ms. Rixham.  He testified that she sounded eager to meet and discuss the resolution of both the Front Yard Project and the Golden Gate Loan.  However, she never followed through and never met with Mr. Fridman.  Mr. Fridman then hired an attorney who filed a Maryland Home Improvement Commission complaint against Houston's in fall of 2008.  As for that, Mr. Fridman explained:

> A:     It didn't go anywhere. It didn't go -- and in fact, well, the Home Improvement Commission assigned an investigator to work on the case.  And the investigator found out that the Houston's Custom Home Design (sic) was not a licensed company at the time they were working on the project on my front yard.  That -- that was the resolution.[8]
>
> Q:     (By Mr. Burns):  All right. And you testified that you then commenced a civil claim?
>
> A:     That's right.

*Id.* at 63.

---

[8] In other words, because Houston's did not have a home improvement contractor's license, the MHIC had no jurisdiction over the claim.

13

With the foregoing tale of woe as the backdrop, Mr. Fridman testified as to the specific misrepresentations made to him by Ms. Rixham.

> The fact is that Lisa told me that the company is licensed and bonded, which was not true to begin with (sic). The fact that she said that the company is in good financial standing, which was not true, as well, I -- again, she had a loan against and she put her house as collateral for the 75,000. And if she would have told me that -- so again, the company wasn't licensed. So I was told it was, and it wasn't true. The company was not in good financial standing. And the fact that the company couldn't even take on this project (sic). I mean, I'm not even talking about completing the project. They don't have any knowledge and skills required to complete this job. And it turned out -- I learned that later.

*Id.* at 64. For emphasis, Mr. Fridman summed his position up succinctly:

> Four things: the company was not licensed and I was lied about it (sic); the company was not in good financial standing and I was lied about it (sic); the company couldn't complete the project and I was lied about it (sic); and they had no intention to repay my personal loan and I was lied about it (sic).
>
> And I was lied about all these facts (sic) by Lisa Rixham.

*Id.* at 66.

None of Golden Gate's $75,000 loan to Houston's was ever repaid nor was the Front Yard Project completed or the payments refunded. On cross-examination, Mr. Fridman acknowledged that Golden Gate observes all mandated corporate formalities and files its tax returns. In that regard, Golden Gate reported a bad debt loss for the unpaid $75,000 loan and presumably received the corresponding benefit. Def's Exh. 13. Also, it was acknowledged by Mr. Fridman that Golden Gate, and not himself, was identified as the lender on the self-drafted note.

### 2.    *Lisa Rixham*

Ms. Rixham was called next as a witness by Mr. Fridman. She testified that she was Houston's President from 2006 to 2008, the year the company ceased operating. She also

14

testified that she was responsible for managing most aspects of Houston's affairs, including its financial operations. She did not negotiate Houston's contracts with consumers but she did sometimes sell retail items in the showroom. Tr. at 123, 145-146.

Ms. Rixham stated that Houston's owed more debt than it had in assets on the books in 2006 and 2007. *Id.* at 124. She said that Houston's needed financing to finish its showroom and borrowed $75,000 from Bernard Caplan in 2006. She professed to have little knowledge of either Houston's transactions with Mr. Caplan, or a lawsuit filed by Mr. Caplan against Houston's, that followed in their wake. Ms. Rixham confirmed that Houston's did not have its own MHIC license, but instead used Mr. Becker's.

> Q:     (By Mr. Burns?):  Right.  And the question is how was Houston's Custom Home and Design Inc. performing home improvement work without a license and number in its name?
>
> A:     (Ms. Rixham):  The work that was performed that required MHIC license (sic) was overseen by Steve Becker and his license.
>
> Q:     Okay.  So is it your testimony that the work that Houston's Custom Home and Design performed, was being performed under Steve Becker's MHIC number at all times?
>
> A:     It depended on the particular job, if it required (sic).
>
> Q:     Okay.  And were there jobs that you believed did not require an MHIC number or license for home improvement?
>
> A:     I really -- I can't answer that question, because I'm not a certified MHIC license holder, so I really don't know.

Tr. at 126-27.

Ms. Rixham confirmed that she met Mr. Fridman at Houston's showroom but denied telling him that Houston's was licensed and bonded. *Id.* at 133-34. She admitted that she

attended the social, dining affair at Mr. Fridman's house and testified that it occurred on a

Sunday of Labor Day weekend. *Id.* at 197.

As for the $75,000 Golden Gate Loan, Ms. Rixham testified as follows:

> Q:    (By Mr. Burns):  And what did you intend to do with that check for 75,000 dollars that's in evidence today?
>
> A:    (Ms. Rixham):  It was to honor the agreement we had with Mr. Caplan.
>
> Q:    Okay. Had you discussed that at all with Mr. Fridman?
>
> A:    No, sir.
>
> Q:    Okay. Had you discussed that with anyone, the use of the funds?
>
> A:    I had discussed it -- let me see, that was in 2007 -- with Steve Becker and Michael Ledwith.
>
> Q:    Why did you believe you had the ability to use Mr. Fridman's 75,000 dollars to pay a loan back to Mr. Caplan?
>
> A:    Because that's what we did with the money that came in.  I mean, we needed to honor that loan and Michael brought in that check.  It was also -- that's what we did with our money.
>
> *                *                *
>
> Q:    How did you -- how did the company intend to pay Mr. Fridman back on his 75,000-dollar loan?
>
> A:    It's never been clear, because we've really never sat down to do an agreement.

*Id.* at 136-37.  Revisiting the same ground, she testified:

> Q:    (By Mr. Burns):  All right.  So I ask you, again, as the president of the company, what basis for authority (sic), at all, did you believe you had from Golden Gate Enterprises and Mr. Fridman, to use that money to pay off Mr. Caplan's loan?
>
> A:    (Ms. Rixham):  I didn't -- I really can't answer the question.

16

> Q:     If money comes into Houston's, or came into Houston's at
>        that time, without payment instructions or agreements, did
>        you simply apply it as you thought fit, as the president, in
>        your discretion, your unilateral discretion?
>
> A:     It wasn't always my discretion to do so.  Again, I had two
>        other shareholders, and we made decisions together.
>
> Q:     What did you understand from your shareholders was the
>        purpose of the 75,000-dollar check that you had received?
>
> A:     I don't recall.

*Id.* at 138-39.

Ms. Rixham agreed there was no written memorialization when Golden Gate's check was delivered but nevertheless, she proposed to have Houston's repay the Golden Gate Loan within 18 months.  This was her stated belief despite Houston's being "cash poor" in 2006 and 2007 and its circular borrowings from both Mr. Caplan and Mr. Fridman.  *Id.* at 143.

Ms. Rixham acknowledged that she never told Mr. Fridman the truth of what they intended to do with the Golden Gate Loan.

> Q:     (By Mr. Burns):  Did you ever speak to Mr. Fridman
>        concerning the use of his monies to pay what was,
>        essentially, an IDOT on your home?
>
> A:     (Ms. Rixham):  No, sir. Nuh-huh.

*Id.* at 144.

As for the FYP Agreement, Ms. Rixham asserted that she did not review the agreement before it was signed and did not decide to include Mr. Becker's MHIC license number on its face.

The IDOT for the Caplan Loan and the Certificate of Satisfaction were admitted as Pl.'s Exh. 10.  Ms. Rixham further acknowledged that she and Mr. Becker were aware of the approaching deadline to pay the Caplan Loan at the time the Golden Gate Loan was made.  *Id.* at

147.  Ms. Rixham acknowledged that approximately $73,000 of the Golden Gate Loan was used to pay off the Caplan Loan just before it was about to become due.  Upon payment, the IDOT was released from her home.  Her testimony concluded with the acknowledgement that none of the Golden Gate Loan was ever repaid.

### 3.    Tamara Friedman

Ms. Friedman was then called to testify.  She stated that during the day-long brunch event at their home, there were discussions regarding she and Mr. Fridman providing financial assistance to Houston's.

> Q:    (By Mr. Burns):  What, if anything, did Lisa Rixham ask
> for financially, at that meeting, at that dinner?
>
> A:    (Ms. Friedman):  At that meeting, I don't know about like --
> I didn't hear exactly the amount, but she was saying that the
> company would definitely benefit if we're going to be
> involved the growing of the company (sic).

Tr. at 170.  Ms. Friedman recalled that Ms. Rixham represented Houston's to be financially stable and doing well.  She could not recall Ms. Rixham saying anything about whether Houston's had a home improvement license.  With that Mr. Fridman rested his case.  Ms. Rixham's defense began with her being recalled to the stand.

### 4.    Lisa Rixham

Ms. Rixham testified that she was approached by Mr. Ledwith and a Johnathan Lewis in 2006 about starting the business that became Houston's.  Houston's was actually incorporated in 2007 by Ms. Rixham, Mr. Ledwith, and Mr. Becker, each of whom became officers.  Tr. at 186-87.

According to Ms. Rixham, Mr. Ledwith was responsible for estimating remodeling contracts and supervising the work.  As for the necessity of a home improvement license, Ms. Rixham testified:

Q:      (By Mr. Coon):  Was your understanding at the time in
        2007 of the licensure requirements of Houston's in order to
        do work like what was being done at the Fridman residence
        (sic)?

A:      (Ms. Rixham):  I really didn't have any understanding.  I
        mean, I -- I didn't quote the job.  I'm not familiar with what
        the MIC -- I'm sorry, MHIC license says, what particular
        things can and cannot be done underneath of the license
        (sic).  I don't know.

Q:      Were you aware at the time that a Maryland home-
        improvement license would be necessary for landscaping?

A:      No, I wasn't, not for landscaping.

Q:      Were you aware at the time that it would be necessary for
        doing things like a decorative fence or wall on the exterior
        of the home?

A:      No, I wasn't, not for landscaping.

*Id.* at 195.  However, she also asserted that Mr. Becker had approved the use of his license

number on Houston's contracts.

Q:      (By Mr. Coon):  What's your understanding of why Mr.
        Becker's number was on the contract?

A:      (Ms. Rixham):  He app --

Q:      Not just that contract, but other contracts?

A:      He approved it. He was a shareholder of our company.

*Id.* at 196.

With that, Ms. Rixham rested her case.  Mr. Fridman then called Mr. Bernard Caplan as a

rebuttal witness.

        *5.     Bernard Caplan*

Mr. Caplan testified that he contracted with Houston's in 2006 to install a "water feature"

in his yard.  Tr. at 210-11.  He also testified Mr. Ledwith and Ms. Rixham requested that he

personally loan Houston's, then a start-up, a total of $75,000. He asserted that the water feature would be constructed by Houston's as consideration for the loan. *Id.* at 212-13. However, Mr. Caplan testified, as soon as he made the loan, Houston's abandoned the project. He sued Houston's and the matter was settled but Houston's did not honor the settlement. *Id.* at 215-16. Nevertheless, the Caplan Loan was secured by the IDOT and Mr. Caplan confirmed that it was repaid just prior to its maturity date.

> Q:      (By Mr. Burns): Mr. Caplan, do you recognize those two
>          documents that are already in evidence?
>
> A:      (Mr. Caplan): Yes, I do.
>
> Q:      And did you prepare them or have them prepared at your
>          request?
>
> A:      Yes.
>
> Q:      And please note the last one, which is certificate of
>          satisfaction (sic).
>
> A:      Yes, August 22nd, 2007, that is when the note was repaid.
>
> Q:      And how did it occur, by mail, by visit?
>
> A:      It was paid in person, and --
>
> Q:      By whom?
>
> A:      -- by -- by Lisa.
>
> Q:      All right, and do you know where she got the sum of
>          money to repay it?
>
> A:      I have no idea.

*Id.* at 214-15.

> 6.      *Steven Becker*

Mr. Becker was also called as a rebuttal witness. He confirmed that he had a Maryland home improvement license and was working for Houston's in 2007.

20

> Q:      (By Mr. Burns):  How were you to sell jobs, then, in
>          connection with Houston's?  How did it work?
>
> A:      (Mr. Becker):  It was basically that the contracts that were
>          written up for the jobs that I priced would have my license
>          number, along with my name, and my signature.
>
> Q:      Okay, did you ever loan your MHIC license out to
>          Houston's for any other purpose?
>
> A:      No.

Tr. at 218.  He went on to describe the relationship between Houston's and his business, SrB

Design Build.  He testified:

> Q:      (By Mr. Burns):  It's been described in testimony, by Ms.
>          Rixham, that you functioned as an employee, receiving
>          periodic payments from Houston, such that you were under
>          the control of Houston's as an employee.  Is that true?
>
> A:      (Mr. Becker):  I was not as an employee (sic).  When I
>          received payment from Houston's the payments were to
>          SrB Design Build.  Unless it was for reimbursement when I
>          would purchase materials with my credit card for jobs.

*Id.* at 219.

Mr. Becker testified that he didn't assist in preparing the contract for Mr. Fridman's

project and did not authorize the use of his MHIC license number on that contract.  He explained

that only contracts that properly bore his license number and signature were those authorized by

him for Houston's.  His testimony continued:

> Q:      (By Mr. Burns):  Why would you be signing a document
>          for a contract with Houston's if your company is SrB
>          Design?
>
> A:      (Mr. Becker):  Because I was to -- to sell projects for
>          Houston's, at the -- initially, we were going to be trying to
>          establish in a part -- partnership, and Mike and Lisa already
>          had the business.  So my job was to -- to sell and bid these
>          type -- this type of work for them.

21

Q:    What is the distinction, if any, in a contract that you signed with your MHIC number, and a contract that someone else signs with your MHIC number?

A:    It has my name and my --

Q:    As far as your permission?

A:    -- my name and my signature.

Q:    Yeah, but I mean is one authorized by you and that's okay, under the operations of the use of the license, or not?

A:    Well, only I can use my license number.

*Id.* at 221-22.

Finally, Mr. Becker testified as to the use of the proceeds of the Golden Gate Loan.

Q:    (By Mr. Burns):  Okay, and do you recall a conference call, or a meeting, or discussions with yourself, Michael Ledwith, and Lisa Rixham, about what to do with that check?

A:    (Mr. Becker):  I don't recall whether or not that there was a full meeting, as far as all three of us deciding what to do.  I just remember that Lisa was very upset that she had an existing loan that was coming due against her house, and -- and that she needed to get it paid off.  It was coming due.

Q:    Do you know what decision she made about getting that loan paid off?  What did she decide to do?

A:    She decided to -- well, I -- I guess she had the loan from Fridman to pay that.

Q:    You guess, or do you know?

A:    Well, I know.

Q:    How do you know?

A:    Because after the check was obtained, she had calmed down, she had not -- she was not complaining about it anymore.  She wasn't worried about it.  And -- and she had said that she was going to use it to pay it off.

*Id.* at 224.

On cross examination, Mr. Becker acknowledged that he allowed Houston's to use his MHIC number either when he was in charge of and/or supervising a job.  He also conceded that for a period of time he received regular, biweekly checks from Houston's and those checks did not correlate to the number of jobs or amount of business he solicited.  Finally, he acknowledged that he helped out on the short-lived Front Yard Project.  *Id.* at 231-32.

### C.    Baltimore County Circuit Court Proceedings

On May 13, 2008, after the MHIC complaint hit a dead-end, Ms. Friedman and Golden Gate filed a complaint (State Court Complaint) in the Circuit Court of Maryland for Baltimore County (Case No. 03C08005399) against Houston's and Mr. Ledwith for breach of contract on the $75,000 loan (State Court Case).  Pl.'s Exh. 2.  On August 12, 2008, the State Court Complaint was amended to add Mr. Fridman as a plaintiff and Ms. Rixham as a defendant.  The three Plaintiffs also added claims for breach of contract on the FYP Agreement and two counts that alleged Ms. Rixham committed fraud by inducing the $75,000 loan and the landscaping agreement.  Pl.'s Exh. 2.  None of the three Defendants answered or otherwise pled to the Amended Complaint.

An Order of Default was entered against Mr. Ledwith on August 7, 2009 and then against Houston's and Ms. Rixham on August 19, 2009.  Pl.'s Exh. 1 & 2.  Among other things, this included the entry of default findings of fraud against each Defendant.  Then, when the Order of Default was final, on December 2, 2009, Wayne S. Goddard, Esquire entered his appearance on behalf of the State Court Case defendants.  Pl.'s Exh. 1.

A damages inquisition was conducted on December 4, 2009.  Pl.'s Exh.'s 1 & 3. Notwithstanding the finality of the default, Mr. Goddard made an effort to extricate his clients

from liability.  The following exchanges reflect that effort and how the State Court responded by strictly limiting the proceedings to only the damages due.

> Mr. Goddard:  The real issue as I understand it, your Honor, is whether or not Lisa Rixham and Michael Ledwith are also personally liable on the loan contract.  We contend that --
>
> The Court:  Isn't that determined already by default?
>
> Mr. Goddard:  Well, not really.  I'm not sure, your Honor, if the Court has entered a default against Ms. Rixham --
>
> The Court:  It has.
>
> Mr. Goddard:  Okay.
>
> The Court:  That was the most recent. When I looked it was all three parties, the corporate Defendant and the two individuals Defendants.  Ms. Rixham, that took place August 19, 2009.
>
> Mr. Goddard:  We believe that the loan documents only support a judgment -- only support damages against Houston's Custom, Inc.  That's our contention, and I think that's really what the whole bone of contention is at this proceeding.

Pl.'s Exh. 3 at 11-12.  The State Court refused to revisit the question of liability, including especially liability for fraud.

> Mr. Mzhen[9]:  Again, your Honor, keeping in mind that this is damages only, we're not going into the fraud situation circumstances under which the loan was made.
>
> The Court:  Correct.
>
> *       *       *
>
> Mr. Goddard:  Sir, did there come a time you asked Mr. Ledwith and Ms. Rixham to sign a personal guaranty for that loan?
>
> A (By Mr. Fridman):  Yes, I did.
>
> Q:  In fact, that was in 2008, correct --

---

[9] Mr. Mzhen was counsel for the State Court plaintiffs.

Mr. Mzhen:  I object.  That is irrelevant with regard to damages.

The Court:  Sustained. You want to be heard?

Mr. Goddard:  I think it is relevant.

The Court:  How? It relates to damages and not liability (sic).

Mr. Goddard:  Again, unfortunately, your Honor, I think we're going to have a disagreement as to exactly what the role of the Court is here today in regards to this matter, because I believe there is no evidence --

The Court:  That happens frequently.

Mr. Goddard:  Again, I think it is relevant as to whether or not there's individual liability.  There's no dispute there's corporate liability, and I was going to cross-examine the gentleman on the guaranty agreement unsigned (sic).  I think that is relevant.

The Court:  I think the order of default settle (sic) the issue of liability.  Why is order of default (sic) any more clear as to liability as to corporate Defendant (sic)?  What about the word default distinguishes between the three Defendants?

Mr. Goddard:  Well, your Honor, just merely because something is alleged in the complaint, if the evidence is not present to support it -- let's say, for example, this gentleman came in with no checks or no contracts and say I want damages of $75,000.  That would be a very tough case to make to this Court, because there simply is no evidence to support it.  Even as a matter of default, those facts are established.

The Court:  You need to provide me with some case law that supports what you're saying.  I will take a look at it, but my understanding from the case you gave me Tamori vs. Holly (phonetic) typically says when a party fails to answer, a default judgment is granted or order of default is granted, and they have 30 days to file a motion to vacate, and they failed to do that.  As a consequence, an inquisition hearing is set in and the issue of liability is determined.  It is a little late now in the game to argue that the individuals are not liable.

Mr. Goddard:  All we're saying, your Honor, is we believe the damages for breach of contract on the loan are zero as to the individual or especially Ms. Rixham.

The Court:  Why is it zero?

Mr. Goddard:  Because she's not a party on the loan.

The Court:  She's not liable on the loan?

Mr. Goddard:  She is not a contracting party.

The Court:  Then that means she's not liable on the loan.  Wasn't that just totally contradicting what the legal definition of order of default is?

*Id.* at 17, 27-29.

On January 4, 2010, the State Court entered a final judgment (State Court Judgment) (*see* Pl.'s Exh. 1 & 2) against Houston's, Mr. Ledwith, and Ms. Rixham.  The State Court defendants immediately moved to revise the State Court Judgment, but the motion was denied on March 11, 2010.  *See* Pl.'s Ex. 2.  However, on the basis of the State Court plaintiffs' motion, the State Court Judgment regarding Counts I and II of the State Court Complaint against Ms. Rixham was revised upwards to a total of $96,094.68.  *Id.*  The State Court Judgment on Counts III and IV was in the amount of $28,148.  *Id.*

## III.   Procedural History in this Court

On October 25, 2012, Ms. Rixham filed her Voluntary Petition for relief under Chapter 7 of the Bankruptcy Code.  She listed the State Court Judgment on her Schedule D (secured creditors) in the amount of $124,242.68 and included Mr. Fridman, Ms. Friedman and Golden Gate as creditors.  She also listed their attorney in the State Court Case.  Likewise, each creditor was included on Ms. Rixham's creditor mailing matrix and there is no dispute that they received timely notice of her Chapter 7 bankruptcy filing.

On February 1, 2013, however, Mr. Fridman alone filed the Complaint that initiated this Adversary Proceeding.  The Complaint was subsequently amended on February 6, 2014.  (Dkt. No. 55).  By the Amended Complaint, he sought a determination that the State Court Judgment

26

be excepted from Ms. Rixham's discharge pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(a)(4).[10]

It alleged:

> [T]hat Plaintiff was invited to invest in Defendant's company known as Houston's Custom Home Design ("Houston's"). There were numerous meetings between them and two other parties. On August 12, 2007, Defendant reportedly informed Plaintiff at a dinner meeting that Houston's was a growing home development company, in need of cash, and that Defendant and her partner were "lawfully licensed to do home improvement work in Maryland." Although Plaintiff declined to invest in the company, he agreed to loan Defendant and others $75,000.00 as a loan. Moreover, on August 14, 2007, Rixham entered into a contract to perform landscaping work for Plaintiff.

(Am. Compl. ¶7).  Mr. Fridman alleged that Ms. Rixham's "misrepresentations consisted of false statements as to the licensure of the Defendant company and as to the capacity to complete the landscaping project coupled with false statements as to the ability to repay the loan."  (*Id.* at ¶18).  He further alleged that the State Court Judgment could properly be used as a matter of law to preclude and foreclose the issue of whether Ms. Rixham was liable for fraud.  He alleged that the imposition of estoppel would be proper in part because Ms. Rixham had participated in the damage inquisition phase of the State Court Case.  Ms. Rixham filed her Answer on April 5, 2013 (Dkt. No. 10).

The Court approved the parties' Joint Rule 26(f) Report on April 30, 2013 and entered a Scheduling Order that incorporated their proposed deadlines while also scheduling others (Scheduling Order) (Dkt. No. 13).  All discovery was to be completed by June 20, 2013, amendments to the pleadings or additional parties added by June 1, 2013 and dispositive motions

---

[10] Section 523(a)(4) permits a debt to be excepted from discharge when the debt is obtained by, "fraud or defalcation" while the debtor is acting in a "fiduciary capacity", or by, "embezzlement" or "larceny".  Mr. Fridman did not present any evidence that supported a claim under that subsection and hence that cause of action shall be dismissed without further comment.

filed by July 20, 2013.  Trial was set to begin November 5, 2013.  Both sides timely filed

exhibit/witnesses lists on October 22, 2013 and their Pretrial Memoranda on October 29, 2013.

However, on October 28, 2013, eight days prior to trial, Mr. Fridman filed a paper

entitled Motion in Limine for Judgment on Partial Findings of Evidence under Fed. R. Civ. P.

52(c) as to Res Judicata/ Collateral Estoppel (Motion for Judgment) (Dkt. No. 23).[11]  Relying

exclusively upon the raw record of the State Court Case, Mr. Fridman took the position there was

no genuine dispute of material fact as to the merits of the fraud and intentional misrepresentation

claims as they had been fully and fairly litigated as a result of (1) Ms. Rixham's participation in

the inquisition hearing and (2) by the denial of her motion to revise the State Court Judgment.

Mr. Fridman therefore asserted that the "re-litigation" of Ms. Rixham's liability in this Court

would be barred under both the Rooker-Feldman Doctrine and principles of issue preclusion.[12]

---

[11] Per Federal Rule of Bankruptcy Procedure 7052, Federal Rule of Civil Procedure 52 applies in adversary proceedings.  Rule 52(c) provides:

> (c) Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

It appears from its express language that Federal Rule of Civil Procedure 52 is intended to apply to a party's evidentiary presentation "during a nonjury trial" and not with regards to proceedings that transpired in another forum prior to the trial at hand.  The sum and substance of previously completed litigation may of course be utilized in support of a dispositive motion, if timely filed.

[12] Issue preclusion, "precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding."  *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995) (citation omitted).  When a party attempts to assert that a state court judgment commands the application of issue preclusion, "the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel."  *Jordan v. Moore* (*In re Jordan*), 2010 WL 997065, at *5 (D. Md. March 16, 2010) (citing *McNallen*, 62 F.3d at 624)).

The *Rooker Feldman* doctrine holds that "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments."  *Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 319 (4th Cir. 2016) (quoting *Lance v. Dennis*, 546 U.S. 459 (2006)).  The *Rooker-Feldman* doctrine, "assesses only whether the process for appealing a state court judgment to the Supreme Court under 28 U.S.C. § 1257(a) has been sidetracked by an action filed in a district court specifically to review that state court judgment."  *Thana*, 827 F.3d at 320.

Ms. Rixham filed her opposition on November 1, 2013 (Dkt. No. 33). The opposition asserted that, (a) she had not had an opportunity to open and relitigate the fraud/liability issues at the damage inquisition, (b) the Rooker-Feldman doctrine could not negate this Court's exclusive jurisdiction to determine exceptions to discharge, (c) neither claim, nor issue preclusion could apply to foreclose the matter against Ms. Rixham as Section 523(a) was not before the State Court, and (d) the underlying facts of liability, and specifically fraud, had not actually been litigated in light of the entry of default.

On November 5, 2013 (the long-scheduled trial date) Mr. Fridman filed a Motion in Limine to Amend Complaint Solely as to Joinder of Parties (Motion to Amend) (Dkt. No. 35). The Motion to Amend relied upon Fed. R. Civ. P. 15(a)(2), 19(a), and 20(a)(1).[13] In it, Mr. Fridman averred that the Plaintiffs in this Adversary Proceeding should "mirror" the Judgment-Plaintiffs in the State Court Case and that meant Ms. Friedman and Golden Gate should be added as party-plaintiffs "as a matter of form", with the amendment termed only "clerical" in nature.

The sweeping relief sought by Mr. Fridman's "eve of trial" motions – the summary disposal of the dispute in Mr. Fridman's favor via preclusion doctrines and the addition of new plaintiffs – dictated that they should have been filed in accordance with the deadlines of the Scheduling Order and long before the trial date. Nevertheless, the Oversigned did not feel comfortable summarily disposing of the motions without a comprehensive, thorough review. Hence, the trial was *sua sponte* continued, a briefing schedule set and an oral ruling date of December 20, 2013 was fixed on the calendar (Dkt. No. 38). Trial, if needed, was rescheduled for February 10, 2014.

---

[13] Those rules of civil procedure are made applicable in bankruptcy adversary proceedings by Bankruptcy Rules 7015, 7019, and 7020.

In response to the Motion to Amend, Ms. Rixham filed her Opposition and Motion to Strike on November 13, 2013 (Dkt. No. 37). She alleged that (1) the Motion to Amend was in reality a joinder motion pursuant to Rule 20(a)(1) that was nevertheless defective because the putative plaintiffs, and not Mr. Fridman, were required to seek leave to become parties, (2) the Motion to Amend was untimely because the 60 day period afforded by Bankruptcy Rule 4007(c) to file exceptions to discharge had long ago expired against the proposed plaintiffs and their independent claims, and (3) the request to join new parties was untimely under the Scheduling Order (Dkt. No. 37).

On November 15, 2013, Mr. Fridman filed an Amended Motion in Limine for Judgment on Partial Findings of Evidence under Fed. R. Civ. P. 52(c) as to Res Judicata/Collateral Estoppel (Amended Motion for Judgment) (Dkt. No. 40). Mr. Fridman asserted that both motions for judgment were purely evidentiary and were intended only "to conserve time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established." (Amended Motion for Judgment at ¶6). In other words, the preclusive motions were proffered only to save precious time. Ms. Rixham filed an opposition on November 25, 2013 to both the Amended Motion for Judgment and the Amended Motion in Limine (Dkt. No. 41).

The Court denied the vast majority of the relief requested by Mr. Fridman at the December 20th hearing. As for the attempt to win a mis-named summary judgment victory through the assertion that the State Court Judgment precluded an inquiry into fraud and therefore the evidence should be strictly limited in accord with that boundary, the Court ruled as follows:

> I can't point to anything in the state court and find that a fact finding was made on the crucial issues that need to be determined in order to except the debt from discharge here. That just didn't happen. And with the force and weight of law that says that a default cannot lend itself to issue preclusion, even with cases like

> the one I just authored, *Reed v. Reed*, and the *Bernstein* case and
> *Nestorio*. In those cases, it seems to me there is a distinction that
> might not matter, or might not seem to be fair to a layperson, but
> from the perspective of the law and what needs to happen
> institutionally, and precedent-wise, I can certainly understand why
> the distinction is drawn. And, especially in this case why there
> was no opportunity … to litigate or to make findings on the issues
> that need to be resolved in order to determine whether or not the
> debt can be excepted from discharge.

December 20, 2013 Hrg. Tr. at 55:10 - 55:30.[14]

Hence, the State Court Judgment was held not to be preclusive as to Ms. Rixham on the

question of fraud. As for the attempt to include additional Plaintiffs, the Court ruled that to the

extent Ms. Friedman and Golden Gate were individual creditors of Ms. Rixham, they had a duty

and obligation to seek to have their independent claims excepted from discharge in a timely

fashion.[15] The deadline in Ms. Rixham's case was February 4, 2013. Because the deadline had

long ago expired, the putative plaintiffs could not be added. However, because Ms. Rixham did

not object to the request to include an additional of $28,148 in damages, that amendment was

allowed.

The Amended Complaint (filed on February 6, 2014) sought to have debts of $95,094.68

and $28,148.00, respectively, excepted from Ms. Rixham's discharge. Trial was held and

concluded on February 10, 2014 and post-trial argument was completed on July 23, 2014.

---

[14] Where a defendant has purposefully participated in a case – as in *Reed v. Reed (In re Reed)*, 2013 WL 6497926, (Bankr. D. Md. Dec. 11, 2013), *aff'd*, 2014 WL 4926187 (D. Md. Sept. 30, 2014)*, Ramsey v. Bernstein (In re Bernstein)*, 197 B.R. 475 (Bankr. D. Md. 1996), and *Nestorio v. Assocs. Commer. Corp. (In re Nestorio)*, 250 B.R. 50 (D. Md. 2000), *aff'd*, 5 F. App'x 283 (4th Cir. 2001) – but then abandons the litigation, it may be proper to conclude that she had a full and fair opportunity to litigate on the merits and hence is precluded by adverse findings. But Ms. Rixham did not participate at all in the liability phase of the State Court Case. Accordingly, this Court held that the State Court Judgment did not have preclusive effect as to liability issues, especially issues of fraud.

[15] Rule 4007(c) provides that a plaintiff must file a complaint under Section 523(c) (which includes fraud claims under Section 523(a)(2)) no later than sixty days after the first date set for the meeting of creditors under §341(a). *See, e.g.*, *Kontrick v. Ryan*, 540 U.S. 443, 448 & n.3 (2004); *Klaas v. Donovan (In re Donovan)*, 411 B.R. 756, 759-62 (Bankr. S.D. Fla. 2009); *In re Zyndorf*, 44 B.R. 77, 78 (Bankr. N.D. Ohio 1984). There is no dispute that neither Ms. Friedman nor Golden Gate filed timely complaints.

**IV.** **Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).  The parties have consented to the entry of a final judgment on the merits and therefore this Court finds that the entry of a final judgment will not offend the strictures of *Stern v. Marshall,* 564 U.S. 462 (2011) and is in compliance with *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) (holding that parties may knowingly and voluntarily consent to adjudication of claim by Bankruptcy Court).  Venue is proper under 28 U.S.C. §1409(a).

**V.** **Legal Standard**

The issue is whether the debt owed to Mr. Fridman by Ms. Rixham is non-dischargeable. Mr. Fridman bases his non-dischargeability claim on §523(a)(2)(A), which provides:

> (a)    A discharge under . . . this title does not discharge an individual debtor from any debt –
>
> (2)    for money, property, services, or an extension, renewal,  or refinancing of credit, to the extent obtained, by—
>
> (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

Generally speaking, the exceptions to discharge enumerated in Section 523 are construed narrowly in order to "protect the purpose of [the Bankruptcy Code of] providing debtors a fresh start." *Fleming v. Gordon (In re Gordon)*, 491 B.R. 691, 697 (Bankr. D. Md. 2013).

In order to prevail in a nondischargeability action under §523(a)(2)(A), the plaintiff must satisfy five elements.  *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v. Lindsley (In re Lindsley),* 388 B.R. 661, 668 (Bankr. D. Md. 2008).  Those elements

are: (1) that the defendant made a representation, (2) that the defendant knew at the time the representation was made that it was false, (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff, (4) that the plaintiff justifiably relied upon the false representation, and (5) that the plaintiff suffered damages as a proximate result of the representation. *Lindsley*, 388 B.R. at 668. The burden of proof is on the creditor to establish by a preponderance of the evidence that a debt is not dischargeable. *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)); *Colombo Bank v. Sharp*, 477 B.R. 613, 619 (D. Md. 2008).

A misrepresentation constitutes any words or conduct, which produce a false or misleading impression of fact in the mind of another. *Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999), *aff'd*, 219 F.3d 372 (4th Cir. 2000). Further, "[a]n omission may constitute a misrepresentation where the circumstances are such that the omission creates a false impression." *Ortman v. Reinheimer (In re Reinheimer)*, 509 B.R. 12, 19 (Bankr. D. Md. 2014); *Gordon*, 491 B.R. at 701. The debtor's intent shall be determined subjectively with the totality of the relevant circumstances taken into account. *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *Pleasants*, 231 B.R. at 898. The standard of reliance under Section 523(a)(2)(A) is the lesser one of justifiable (as opposed to reasonable) and that element is also to be assessed in accordance with the overall circumstances of the case. *Field v. Mans*, 516 U.S. 59, 73, 116 S. Ct. 437, 445, 133 L. Ed. 2d 351 (1995); *Colombo Bank v. Sharp (In re Sharp)*, 340 F. App'x. 899, 906, 2009 WL 2480841, at *5 (4th Cir. 2009).

**VI.**    <u>**Discussion**</u>

 **A.** **The Court Concludes that Mr. Fridman can Enforce the Exception to Discharge Claim, Notwithstanding his Use of Golden Gate to Make the Loan.**

 This case presents a very close question.  There is no doubt that a debt is owed – Ms. Rixham acknowledged on her Schedule D that Mr. Fridman is her undisputed judgment creditor as a result of the State Court Judgment.  However, although alleged in the Amended Complaint, the question of fraud was not fully and fairly litigated on the merits in the State Court Case. Therefore, Mr. Fridman was left with the task of having to prove fraud such that the debt sued upon can be excepted from Ms. Rixham's discharge.  Given the transactional history, his only significant roadblock is the fact that he purposefully and voluntarily chose to funnel the payments through his wholly-owned corporation, Golden Gate.  Hence the question becomes whether the word "debt" in Section 523(c) should be interpreted expansively enough in this context to include the injury inflicted by Ms. Rixham's participation in the underlying scheme. The Court has wrestled with the pros and cons but in the end concludes that (a) Mr. Fridman was personally defrauded, (b) Ms. Rixham took his money to be used for her own personal benefit, and (c) the debt therefore must be excepted from her discharge.

 Golden Gate was used to lend the $75,000 to Houston's and likewise made $34,003 in total payments to Houston's for the Front Yard Project.  It also took a "bad debt" deduction on its 2008 corporate tax return as a result of the loss.  Golden Gate did not timely assert a Section 523(a)(2) claim as a party plaintiff and therefore was not in a position to have its independent debt declared non-dischargeable.  Section 523(c) expressly provides that, "the debtor shall be discharged from a debt of a kind specified in [§523(a)(2), (4), or (6)] unless, on request of the *creditor to whom such debt is owed* … the court determines such debt to be excepted from discharge…" (emphasis added).  Therefore, Mr. Fridman was obligated to establish that the debt

owed to him was obtained by fraud. In the wake of full trial on the merits, one might now reasonably conclude that, since the State Court Judgment on liability has no preclusive effect as to fraud, Mr. Fridman's actual debt is against Golden Gate. He did not personally lend money directly to Ms. Rixham. But it is equally true that the money came from his individual assets and that he was the one fraudulently induced by Ms. Rixham and her cohorts to make the Golden Gate Loan and partially fund the Front Yard Project. *Hence, it is indisputable that Mr. Fridman bore the real injury.*[16]

The general rule is that a corporation is an entity, separate and distinct from its shareholders. *U.S. v. Brager Bldg. & Land Corp.*, 124 F.2d 349, 350 (4th Cir. 1941) (citing *Dalton v. Bowers*, 287 U.S. 404, 53 S. Ct. 205 (1932)); *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 822 A.2d 478, 490 (Md. Ct. Spec. App. 2003). Thus, the rights and claims of a corporation belong to the corporation and not to its shareholders. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 343 (Md. 2009); *see also Marchman v. NCNB Texas Nat. Bank*, 898 P.2d 709, 716 (N.M. 1995). Although corporate shareholders may suffer indirect harm, the right of recovery belongs exclusively to the corporation. *Shenker*, 411 Md. at 343 (citing *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946)); *NCNB Nat. Bank of N. Carolina v. Tiller*, 814 F.2d 931, 937 (4th Cir. 1987), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990) (holding that "only the corporation may vindicate its rights").

Yet, notwithstanding that settled hornbook law, the Court would have to reject reality to conclude that Mr. Fridman was not personally and directly injured by Ms. Rixham's fraudulent conduct. Stated differently, it's not as if the evidence showed that Golden Gate had its own separate assets and that those assets were used to make the subject payments. Therefore, the

---

[16] The Court notes again that there was no evidence presented as to whether the money that funded the $14,003 progress payment on the Front Yard Project came from the home equity line of credit or from some other source.

corporate separateness should not be permitted to shield Defendant from individual liability. *See e.g.*, *Wilcoxon Construction, Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 522 (Bankr. D. Md. 1995). While *Woodall* holds that a debtor may not hide her fraud behind her own defensive, corporate shield, this Court concludes that the same logic should apply here in the reverse to negate Ms. Rixham's offensive deployment of the technical transactional framework to the same improper end.

The Court recognizes that Mr. Fridman took several steps that undercut his position. He used Golden Gate to make the loan. He signed-off on Golden Gate's bad debt tax loss. He prepared a promissory note that did not include him as an obligee. He failed to include Ms. Rixham personally as an obligor on the note. And he failed to include Golden Gate as a plaintiff in this case.

And then, when it was past the eleventh hour, Mr. Fridman (1) sought a dispositive ruling that the State Court Judgment as to liability equaled claim and issue preclusion sufficient to enter a "partial" judgment in his favor as to fraud and (2) sought to add Golden Gate and Ms. Friedman as Plaintiffs. The rational conclusion is that both requests were made in order to diffuse the impact of not having Golden Gate as a party plaintiff in the first place. Yet, in the end, the Court concludes that Ms. Rixham's fraudulent behavior directly injured Mr. Fridman and hence he must prevail, notwithstanding, those lapses. This is so because the fraud exception has consistently been interpreted in a comprehensive manner where warranted by the facts.

In *Cohen v. De La Cruz*, the Supreme Court restated the policy behind Section 523(a)(2) that the Bankruptcy Code prohibits debtors from discharging liabilities incurred on account of their fraud, "embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor'". 523 U.S. 213, 217, 118 S. Ct. 1212, 1216 (1998) (citing *Garner*, 498

U.S. at 287 and *Brown v. Felsen*, 442 U.S. 127, 138, 99 S. Ct. 2205, 2212-13 (1979)).  The Court explained that:

> the phrase "to the extent obtained by" in § 523(a)(2)(A), as the Court of Appeals recognized, does not impose any limitation on the extent to which "any debt" arising from fraud is excepted from discharge. "[T]o the extent obtained by" modifies "money, property, services, or ... credit"—not "any debt"—so that the exception encompasses "any debt ... for money, property, services, or ... credit, to the extent [that the money, property, services, or ... credit is] obtained by" fraud. The phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. *Once it is established that specific money or property has been obtained by fraud, however, "any debt" arising therefrom is excepted from discharge.*

*Cohen*, 523 U.S. at 218 (emphasis added).

This broad interpretation manifests in *Pleasants*, where the Fourth Circuit Court of Appeals specifically rejected the argument that Section 523(a)(2)(A)'s "obtained by" language requires that some portion of a creditor's claim must have been directly transferred from the creditor to the debtor.  219 F.3d at 375 (citing *Cohen*, 523 U.S. at 218).  The *Pleasants* Court held that the language of Section 523(a)(2)(A) was "broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor." *Pleasants*, 219 F.3d at 375.  Most recently, in *Husky v. Ritz*, 136 S. Ct. 1581 (2016), the Supreme Court enhanced its expansive view of the fraud exception, wherein the Court made it clear that Section 523(a)(2)(A)'s use of the term "actual fraud" is broad enough to include fraudulent conveyances whether the actual "debt" sued upon was obtained by the transfer or not. Notwithstanding, the somewhat convoluted circumstances that underlie the debt and especially the technical "ownership" in Golden Gate, the Court will find in Mr. Fridman's favor under the more liberal umbrella in order to remedy the fraudulent conduct that Ms. Rixham had a prime role in perpetrating.

**B.      The Court Concludes that the Debt Shall be Excepted from the Debtor's Discharge under Section 523(a)(2)(A).**

*1.      Were representations made?*

The answer here is yes.  The Court finds that the two essential affirmative misrepresentations attributed to Ms. Rixham were in fact made by her.  These were (1) that the purpose of the $75,000 loan was to help Houston's manage the large influx of business, and (2) that Houston's was bonded, licensed and able to handle the projects proposed by Mr. Fridman. *See Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 220 (B.A.P. 1st Cir. 2002) (holding that misrepresentations regarding a professional license go to very essence of an agreement, *i.e.*, "the reliance by the contracting party that the debtor has the requisite knowledge"); *Pleasants*, 231 B.R. 893 (holding that misrepresentation regarding professional license is sufficient under §523(a)(2)(A) because professional licenses carry with them degree of presumed competence). The most important misrepresentation should be added to these, *i.e.*, Ms. Rixham's silence as to the existence of the Caplan Loan, the IDOT that secured it and her intention to use the proceeds of the Golden Gate Loan to pay the Caplan Loan off and secure the IDOT's release.  There were three key misrepresentations in this case – two overt and one silent – and the Court finds that Ms. Rixham to be the responsible party for each one.

*2.      Did Ms. Rixham know at the time the representations were made that they were false?*

Based on the totality of the record in this proceeding, the Court concludes that Ms. Rixham knew the representations were false at the time she made them.  The evidence establishes that she knew the Caplan Loan was coming due in August 2007.  She had no other means to pay that loan and it was secured by an IDOT against her personal residence.  Yet she did not tell Mr. Fridman that she intended to use the Golden Gate Loan to pay Mr. Caplan. Likewise, Houston's did not have a Maryland home improvement contractor's license, nor was

Houston's financially fit, or professionally capable, to manage or complete the Front yard Project. Ms. Rixham, as Houston's President, has to be charged with knowledge of the truth as to those facts, especially as compared to the representations made.

> 3. *Did Ms. Rixham make the misrepresentations with the intent and purpose of deceiving Mr. Fridman?*

The Court concludes that Ms. Rixham did indeed make the misrepresentations with the intention of deceiving Mr. Fridman. Ms. Rixham had a very compelling, yet undisclosed, reason to obtain the loan from Mr. Fridman – she was in danger of losing her personal residence if the Caplan Loan was not paid. Neither she nor Houston's had any readily available means to pay Mr. Caplan and Houston's was, in the light of hindsight, in a precarious financial position. Indeed, it appears to have folded its tent and ceased operations not long after obtaining the Golden Gate Loan. If Ms. Rixham had revealed the truth about why the loan was needed, or that Houston's was not licensed, or was not financially competent, it is a certainty Mr. Fridman would not have caused Golden Gate to lend the money. This transaction reeks of fraud and it is imminently reasonable to conclude that the money was solicited solely to pay the Caplan Loan with no intention of repayment to Mr. Fridman. The abandonment of the Front Yard Project is sure confirmation of this. This conclusion is even more compelling when one considers that the first proposal to Mr. Fridman was for him to invest in Houston's with no direct, repayment obligation on the part of Houston's or its principals. That would have made collection much more problematic. Likewise with respect to Ms. Rixham's $70,000 to $80,000 cost estimate for the abandoned Front Yard Project, which roughly equates to the amount of money she needed to pay off the Caplan Loan. The Court concludes that the principals of Houston's never had any intention of completing that work.

4.      *Was Mr. Fridman's reliance justifiable?*

Mr. Fridman's reliance was justifiable.  He believed the $75,000 would be used to enhance Houston's business, not to pay a pre-existing, undisclosed loan.  He testified that the presence of a home improvement license was important to him personally and a professional license does confirm a higher level of skill and expertise.  *See Creta*, 271 B.R. at 220 (where misrepresentation regarding license was substantial factor in entering into transaction and debtor's work later appears defective, the creditor has established that defects derive directly from lack of professional qualifications).  He was aware of and noted that an MHIC license number was listed on the FYP Agreement.  Mr. Fridman attended the open house at Houston's showroom, spoke with Mr. Ledwith and Ms. Rixham, and was impressed with what they told him about their the business and its capabilities.  He further testified that he visited Houston's web site and believed everything to be in order.  And all of this confidence was reinforced during the parties' all day brunch at his home.  He was rightfully convinced of the *bona fides* of Houston's and its owners and he relied on all of this information when he entered into the subject transactions.  There were no "red flags" that would have alerted Mr. Fridman to the need for further investigation and he justifiably relied upon Ms. Rixham's representations.

5.      *Were damages suffered as a proximate result of the representations?*

The answer here is also yes.  The $75,000 loan was never repaid and the Front Yard Project was never completed.  The construction and landscaping had to be demolished and redone.  These losses were caused by the misrepresentations regarding the unrevealed purpose of the Golden Gate Loan, Houston's unlicensed status, its financial ill-health and its lack of ability

to perform a workmanlike job.  And the injury flows directly to Mr. Fridman's personal

pocketbook.[17]

## VII.    Conclusion

The debt shall therefore be excepted from Ms. Rixham's discharge.  A separate Order

will issue.

cc:    Lisa Ann Rixham, *Debtor-Defendant*
       4240 Cardwell Avenue
       Nottingham, MD 21236

       Curtis C. Coon, *Counsel for Debtor-Defendant*
       Coon & Cole, LLC
       401 Washington Avenue, Suite 501
       Towson, MD 21204

       John D. Burns, Esquire, *Counsel for Plaintiff*
       The Burns Law Firm, LLC
       6303 Ivy Lane; Suite 102
       Greenbelt, Maryland 20770

**End of Opinion**

---

[17]  However, the $14,003 progress payment was not connected via evidence to Mr. Fridman's pocketbook or any other source beyond Golden Gate's account.  Nevertheless, the Court will also except that sum from Ms. Rixham's discharge because it was likewise fraudulently obtained and resulted in the personal damages Mr. Fridman suffered through the abandoned Front Yard Project.  If it can be established, however, that the $14,003 came from a source other than Mr. Fridman, then the Court may be willing to reconsider that element of the total sum excepted.